

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ASHLEY ARNOLD    )
          )
   Plaintiff,    )
          )
   v.       )  No. 01 C 8138
          )
          )  Judge Mark Filip
JANSSEN PHARMACEUTICA, INC., )
and JOHNSON & JOHNSON, INC.  )
          )
   Defendants.   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Ashley Arnold ("Plaintiff" or "Arnold") brings this lawsuit against Defendants Janssen Pharmaceutica, Inc. ("Janssen"), her former employer, and Johnson & Johnson, Inc. ("Johnson & Johnson") (collectively "Defendants") alleging employment discrimination on the basis of sex and disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* The case is before the Court on Defendants' Motion for Summary Judgment on all counts ("Motion"). (D.E. 125.[1]) For the reasons stated below, the Motion is granted in part and denied in part.

---

[1] The designation "D.E." refers to the docket entry number of the cited document.

## I.    Background[2]

Plaintiff, Ashley Arnold, is a woman who worked for Janssen, a wholly owned subsidiary

of Johnson & Johnson, from May 1995 to March 9, 2001. (Def. SF ¶ 1.) Janssen's sales and

marketing organization is comprised of a number of different sales forces, including, the 500,

275 and CNS sales forces. (*Id.* ¶ 4.) The sales organization is comprised of various different

positions. (*Id.* ¶ 5.) The office-based sales representative is an entry level position. (*Id.*) From

there, an employee could be promoted to professional representative, senior representative,

hospital representative, or other designations. (*Id.*) Sales representatives report to a district

---

[2] The Court takes the relevant facts from Defendants' Local Rule 56.1(a)(3) Statement of Uncontested Material Facts (D.E. 125 ("Def. SF")) and exhibits; from Plaintiff's Local Rule 56.1(b)(3) Response to Defendants' Statement of Uncontested Material Facts (D.E. 133) ("Pl. Resp. to SF"); from Plaintiff's Corrected Statement of Additional Facts Requiring Denial of Summary Judgment Pursuant to Local Rule 56.1(b)(3)(B) (D.E. 151-2 ("Pl. SAF")) and exhibits; and from Defendants' Response to Plaintiff's Corrected Statement of Additional Facts (D.E. 162 ("Def. Resp. to SAF")). Where the parties disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court resolves genuine factual ambiguities in Plaintiff's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

Local Rule 56.1 ("L.R. 56.1") requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See, e.g.*, *Koszola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. *See, e.g.*, *Malec*, 191 F.R.D. at 583 ("[A] movant's 56.1(a) statement should contain only factual allegations. It is inappropriate to allege legal conclusions."); *id.* ("Factual allegations not properly supported by citation to the record are nullities."). Additionally, where a party improperly denied a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. *See* L.R. 56.1(a), (b)(3)(B); *see also Malec*, 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). The Court disregards any additional statements of fact contained in a party's response rather than its statement of additional facts. *See Malec*, 191 F.R.D. at 584 (L.R. 56.1(b)(3)(B) statement is the only acceptable means of presenting additional facts to the Court).

manager ("DM"), who reports to a regional business director ("RBD"), who reports to a field sales director ("FSD"). (Id.)[3]

Arnold began working for Janssen in May 1995 as an office-based pharmaceutical sales representative. (Def. SF ¶ 6.) Plaintiff offers evidence of numerous instances in 1995 where persons, including managers, at Janssen treated her in ways she considered discriminatory. She was referred to as "Robert's girl" by John Reardon, a human resources manager (apparently because she was recruited by Robert DelFemine) (Pl. SAF ¶ 27; Def. Resp. to SAF ¶ 27); male peers told her that her successes were only because of her looks (Pl. SAF ¶ 29); supervisors encouraged women, including Arnold, to get in a hot tub so that the women's bodies could be observed (Pl. SAF ¶ 30); she was the subject of sexual jokes and offensive stories (Pl. SAF ¶ 31); and once, at a baseball game, Arnold's breasts were compared to another woman's whom male managers speculated had had breast enhancement surgery (Pl. SAF ¶ 33).[4]

---

[3]     Defendants filed three motions to strike in conjunction with their reply in support of their Motion for Summary Judgment. (D.E. 139 (motion to strike Plaintiff's response to Defendants' statement of uncontested facts), D.E. 141 (motion to strike Plaintiff's statement of additional facts), D.E. 143 (motion to strike affidavits of Plaintiff and Kevin Davis).) The Court granted Plaintiff's motion to submit a "corrected" statement of additional facts, denied as moot Defendants' motions to strike Plaintiff's response, and terminated Defendants' motion to strike the statement of additional facts. (See D.E. 153.) Defendant then filed a motion to strike Plaintiff's corrected statement of additional facts. (D.E. 159.) At this time, the Court has before it fully briefed motions to strike Plaintiff's response, to strike the affidavits, and to strike Plaintiff's corrected statement of additional facts. The Court addresses Defendants' motion to strike the affidavits (D.E. 143) in an Order filed contemporaneously with this opinion. The Court will address the motions to strike Plaintiff's response and corrected statement of additional facts as relevant throughout this opinion. Rather than rule on the individual paragraphs identified by Defendants, the Court will draw only from the portions of the responses that are appropriate, and it will ignore any improper additional statements of fact. Thus, the Court grants in part and denies in part Defendants' remaining motions to strike.

[4]  At an another unspecified time, Randy McGonigal, a regional business director, made remarks to Arnold and other women that a woman's place should be in the kitchen or home in

3

In May 1997, Arnold was promoted to a specialty representative and was shortly thereafter promoted to speciality professional representative. (*Id.*) William Parks, the RBD for the 500 Central Region approved both these promotions. (*Id.*) In January 1998, Plaintiff was promoted to a regional training manager ("RTM") and reported directly to Parks. (*Id.* ¶ 7.) An RTM provides sales-based, skills enhancement training to representatives in the field, and the duties of an RTM include assisting at cycle meetings (unexplained) and riding with sales representatives. (*Id.* ¶ 8.) When Arnold assumed the position, it was a new position, and Arnold defined its scope. (*Id.* ¶ 9.) She provided training services to three different regions. (*Id.*)

In or around August 1999, Plaintiff was promoted to a DM position for the 275 region in Manhattan, New York. (Def. SF ¶ 11.) Plaintiff had an apartment in New York but also maintained a residence in Elmhurst, Illinois, and commuted a disputed amount between the two cities. (Def. SF ¶ 11; Pl. Resp. to SF ¶ 11.) In that position, Arnold reported to Bob Oliver, the RBD for the 275 region, who reported to Bruce Ritchie, FSD for that region. (Def. SF ¶ 11.)

At the time Plaintiff was hired by Defendants, she had not been diagnosed with chronic pain syndrome. (Pl. SAF ¶ 4.) By later 1995, she began having symptoms that affected her functioning at work (Pl. Dep. at 100), and she has since been diagnosed with chronic myofacial and neuropathic pain syndrome (*id.* at 98). She has pain escalations that limit her ability to function, as described in more detail below. According to Plaintiff, as her pain progressed in

---

slippers, and he remarked to Arnold that if a woman got pregnant, she would be off his team. (Pl. SAF ¶ 34.) McGonigal also expressed the view in January 1999 that women belong at home in their "jammies." (*Id.* ¶¶ 35, 41.) Plaintiff reported McGonigal's comments, as well as other complaints about McGonigal, to Brenda Cannady, a human resources manager. (*Id.* ¶ 42; Pl. Dep. at 649.) McGonigal later told Plaintiff that he knew that Plaintiff had spoken with Cannady, and he said something to Arnold about Arnold talking too much and how she needed to watch herself. (*Id.* ¶ 43; Def. Resp. to SAF ¶ 43.)

severity, she informed Parks and Randy McGonigal, her RBDs, every step of the way. (Pl. SAF ¶ 5.) From approximately January through April 2000, Plaintiff's ability to function at work was impaired and she missed some work sessions. (Pl. Resp. to SF ¶ 14.) In April 2000, Arnold took a medical leave of absence, and she returned to work in September 2000. (Def. SF ¶ 14.)

In or around August 2000, Plaintiff requested that her physician give her a note releasing her to return work. (Pl. Resp. to SF ¶ 15.) She returned to work on September 11, 2000, with a work restriction that she not lift anything over 10 pounds and that she have a "local job." (Def. SF ¶ 16.)[5] Due to her restrictions, John Reardon, Janssen's executive director of Organizational Development and Employee Relations ("EROD"), placed Arnold in a temporary, rotation-type position working out of Chicago, where she was to perform discrete assignments and gain exposure to the human resources department. (Id. ¶ 17; Pl. Resp. to SF ¶ 17.) Reardon told Arnold that this was a temporary position. (Def. SF ¶ 18.) Around the same time that Reardon learned that Plaintiff needed to remain in Chicago, Brenda Cannady, an EROD field manager based in Naperville, Illinois, requested a transfer to New Jersey, and, as a result, her position was to become available. (Id. ¶ 19.) Reardon considered Arnold a candidate for Cannady's position. (Id.) Throughout the time Arnold worked the EROD rotation, she remained in the 275 sales organization on Ritchie's headcount and was paid her previous DM salary. (Id. ¶ 21.) While

---

[5] In her affidavit, Plaintiff offered testimony that her lifting restriction was 5-10 pounds. The Court struck the testimony that the restriction might be as low as 5 pounds (instead of 10 pounds), for purposes of summary judgment at least, because such testimony conflicted with pre-affidavit deposition testimony of Plaintiff's in which she indicated her lifting restriction was 10 pounds. The Court reserves the right to allow Plaintiff to testify at trial concerning the 5-10 pound limitation, in which setting the Defendants can cross-examine Plaintiff (and any other medical witnesses) to explore whether the additional testimony is merely a clarification or is simply a fabrication.

Plaintiff worked in this position, she worked mostly out of her home in Elmhurst. (*Id.* ¶ 22.) In late summer or early fall of 2000, Randy McGonigal, the Central Region 275 RBD, took a position as the senior director of sales training and worked out of corporate headquarters in New Jersey. (Def. SF ¶ 32.) McGonigal was replaced by Colleen Jones. (*Id.*)

In January 2001, Reardon advised Arnold that Cannady was not transferring to New Jersey, and thus, the EROD position would not be available. (*Id.* ¶ 26.) Plaintiff interviewed for a reimbursement manager position reporting to Evelyn Sirface, a FSD. (Def. SF ¶ 27.) The parties dispute whether Reardon asked Sirface to interview Arnold (Def. SF ¶ 44) or whether Reardon actively opposed her for that position (Pl. SAF ¶¶ 66-67). Ultimately, the position was given to Jeff Newton, the 275 DM in Chicago. (Def. SF ¶ 42.)

On February 6, 2001, Arnold spoke with 275 RTM Brad Torphy and learned that Newton had been selected for the reimbursement manager position and that Torphy had unofficially been slated to replace Newton as the 275 DM in Chicago. (Pl. SAF ¶ 82.) Arnold did not know that Newton's position might come open, and she called Ritchie and left a message about her interest. (Pl. SAF ¶ 82.) According to Defendants, potential DM candidates learn of openings through a number of different ways, including through FSDs, RBDs, and through the grapevine. (Def. SF ¶ 40.) The parties dispute whether Arnold expressed any interest in a DM position. Defendants offer testimony that between her return from medical leave and February 5, 2001, Arnold did not ask Ritchie or Parks for a DM position or if there were any DM positions available. (Def. SF ¶ 41.) According to Defendants, if Arnold had expressed a timely interest in the 275 DM position, it probably would have been given to her. (Def. SF ¶ 49.) In contrast, Arnold claims that she had informed Ritchie of her interest in a DM position and had never given any indication to anyone at

6

Janssen that she was not interested in working as a DM.[6] (Pl. Resp. to SF ¶ 41.) Torphy was ultimately selected for the position by Colleen Jones with the involvement of McGonigal and Ritchie. (Pl. Resp. ¶ 50.)[7]

Arnold met with Reardon in the Naperville office on February 7, 2001, and Reardon advised her that Ritchie could no longer carry her on his headcount. (Pl. Resp. to SF ¶ 28.) According to testimony by Ritchie, however, Ritchie did not inform Reardon that he needed his headcount back immediately, and he could have carried Arnold for at least another month or so. (Pl. SAF ¶ 89.) Arnold testified that, in a discussion about the 275 DM position, Reardon told her that Torphy was the choice of Janssen management, but he did not tell her that Torphy had already been selected. (Pl. Resp. to SF ¶ 47.) Reardon told her that it had been decided that she would take a job as the 275 RTM. (Id.) Arnold talked with Reardon about past incidents of retaliation and sexual discrimination; she told Reardon that Cannady had assured her that Cannady had told Reardon about every incident Arnold had ever reported. (Pl. Resp. ¶ 29; Pl. SAF ¶ 86.) Reardon told Arnold that he had "forgotten." (Id.)

In the February meeting, Plaintiff discussed with Reardon her lifting restrictions as applied to the RTM job and her view that she could not physically do the job. (Pl. SAF ¶ 84; Pl.

---

[6] Arnold offered testimony that during fall 2000 and early 2001, Arnold had discussions in which she indicated that she was interested in working as a district manager in Chicago to various Janssen managers, including FSD Ritchie, EROD manager Stephany Jones, RBD Colleen Jones, John Reardon, and Robert DelFemine. (Pl. SAF ¶ 94.)

[7] Defendants dispute that anyone but Jones was involved with the decision to not hire Arnold. Arnold offers evidence, however, which could be understood to suggest that McGonigal was involved in the decision (Pl. Ex. 2 (Pl.'s Resps. & Objections to Def.'s Second Set of Interoggs.) at 12) and that Ritchie had the power to tell Jones to hire Arnold (Ritchie Dep. at 59-60).

Dep. 985-90.) Plaintiff requested a number of options instead of taking the 275 RTM position, including that she be made a "senior" RTM with supervisory duties and that she be allowed to work on a part-time or flex-time basis. (Def. SF ¶¶ 30, 34; Pl. Resp. ¶ 34.) Arnold also spoke with Colleen Jones about the RTM position and her lifting restrictions. (Pl. Resp. to SF ¶ 53.) Jones told her that the position did not seem a good fit for Arnold because of the lifting involved with the travel, and that the travel would involve as much as three months spent in Grand Rapids, Michigan, filling in for a district manager. (Id.; Pl. Dep. at 1025.) On February 23, 2001, Plaintiff sent Reardon a fax stating that she considered herself constructively discharged due to actions by Janssen management that constituted discrimination and sexual harassment that affected her both professionally and physically. (Def. SF ¶ 35.) Reardon responded to Plaintiff's fax with a letter, but he ultimately accepted her resignation effective March 9, 2001. (Id. ¶ 36.)

## II.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." Foley v. City of Lafayette, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

It bears emphasis that this case is before the Court on a summary judgment motion. Both sides make various arguments that are essentially predicated on assessments of who is telling the truth and whose claims are too implausible to credit. The Court cannot engage in such assessments when deciding whether summary dismissal is warranted.

## III. Discussion

### A. Title VII Claims

Arnold alleges that she suffered various adverse employment actions at the hands of her supervisors at Janssen on account of her gender and because she complained about the sexist treatment of women by managers. Title VII forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII also forbids an employer to "discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a).

#### 1. Sex Discrimination

A plaintiff may prove intentional employment discrimination under either the direct or indirect methods of proof. "The direct method of proof permits a plaintiff to show, by way of direct or circumstantial evidence, that [her] employer's decision to take an adverse job action against [her] was motivated by an impermissible purpose, such as sex." *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citing *Cianci v. Pettibone Corp.*, 152 F.3d 723, 727

(7th Cir. 1998)). Direct evidence is essentially an "admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* (internal quotation omitted). Otherwise, circumstantial evidence "'must point directly to a discriminatory reason for the employer's action.'" *Id.* (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)). Under the indirect method of proof, a plaintiff must establish a *prima facie* case by proving that she was a member of a protected class; she was performing her job satisfactorily; she experienced an adverse employment action; and similarly situated individuals were treated more favorably. *See id.* Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a non-discriminatory reason for the employment action, and in response, the plaintiff must prove that the employer's proffered reason is a pretext for discrimination. *See id.*

Arnold argues that she has made out a case for sex discrimination based on both methods of proof. Arnold points to, *inter alia*, Janssen's failure to promote her to reimbursement manager in January 2001 in favor of Jeff Newton as an adverse employment action motivated by her gender (Pl. SAF ¶ 73), and Janssen's decision to hire Brad Torphy over her for the 275 DM position near the same time frame (Def. SF ¶ 46, 47).[8] Arnold also points to Janssen's decision to end her EROD rotation. (Pl. SAF ¶ 83.)

Arnold has made out a *prima facie* case under the indirect method by presenting evidence sufficient for a jury to find, at least for Janssen's decision to hire Brad Torphy over her for the 275 DM position, that Defendants were motivated by discriminatory animus. Arnold is female and thus part of a protected class. There is no dispute by Defendants that Arnold was qualified

---

[8] Arnold also points to the removal of her EROD duties, Janssen's intent to demote her to a RTM position, and the refusal to place her in other positions.

for the DM position, and that she could have had that position if she wanted it, even without interviewing. (Def. Resp. to SAF ¶ 92.) The position was filled by Torphy, a male, whom Defendants do not argue had any more qualifications than Arnold or had any other characteristic that would make him anything other than similarly situated to Arnold. Rather, Defendants argue that the position had already been filled by the time they learned Arnold was interested in the position. (Def. SF ¶ 47.) Arnold, however, has created a triable issue of fact as to whether this explanation is pretextual. She has adduced evidence that the 275 DM position was, indeed, still open at the time she expressed interest in it. (*See* Pl. Resp. to SF ¶ 992; Arnold Dep. at 992 (Reardon told Arnold that Brad Torphy was the choice of the "powers that be" but that the decision was not official).) Defendants also offer as an explanation for the failure to hire Arnold as the 275 DM that Arnold did not ask about any available DM positions until February 7, 2001. (Def. SF ¶¶ 41, 46.) But Arnold offers testimony that she spoke with numerous people, including Ritchie and Reardon, after her return from medical leave about her specific interest in a DM position. (Pl. Resp. to SF ¶¶ 46, 94.) If believed, that evidence would demonstrate that the non-discriminatory explanation Defendants have offered is patently false, which demonstrates a triable issue as to pretext. *See Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) ("'The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered.'" (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)). Thus, Defendants' Motion is denied with respect to Arnold's sex discrimination claim.

        2.      Retaliation

Like a sex discrimination claim, a plaintiff may establish a *prima facie* case of retaliation

11

through either the direct or indirect method of proof. Under the direct method, she must present "direct evidence . . . that [she] engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which [she] complains." *Stone v. City of Indianapolis*, 281 F.3d 640, 644 (7th Cir. 2002). The indirect method "requires the plaintiff to show that after filing the charge only [she], and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though [she] was performing [her] job in a satisfactory manner." *Id.* Arnold argues that she has adduced evidence to survive summary judgment under both methods.

Arnold has produced evidence that she engaged in protected activity. In or around January 1999, she complained to Parks and to Brenda Cannady in Human Resources that McGonigal would not discuss giving her a DM job in West Chicago because she was a woman. (Pl. SAF ¶¶ 22-24.) She also complained to Cannady at some point after January 1999 that McGonigal made sexist comments about women belonging at home in their "jammies." (Pl. SAF ¶¶ 41-43.) Defendants suggest that Arnold has not engaged in protected activity because she never filed a charge of discrimination during her employment and never submitted a written complaint. (Motion at 6.) Contrary to cases where no protected activity was found, Defendants have not offered evidence or argument that Janssen had some formalized written complaint procedure of which Arnold did not avail herself. *Compare Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003) (finding no protected activity where plaintiff made only vague complaints and did not utilize policy for reporting harassment). Instead, Defendants offer evidence that Janssen's problem resolution process involved, first, working through an immediate line of management, then to the next level of management, and then to employee

relations. (Def. SF ¶ 59.) Arnold contacted both her supervisor and someone in human resources to report what she considered to be discriminatory actions and comments, actions that a trier of fact could find to have comported with Defendants' policy. Based on the evidence before the Court, Arnold has created, at the minimum, a question of fact as to whether she engaged in protected activity.

For the reasons explained in regard to Arnold's sex discrimination claim, *supra*, she has made out the remaining prongs of her *prima facie* case under the indirect method. She has adduced evidence to show that after she engaged in protected activity she, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though she was performing her job in a satisfactory manner. *Stone*, 281 F.3d at 644. She was not offered the position as the 275 DM, though she was qualified for it, and Brad Torphy, who had not engaged in any protected activity (*see* Pl. SAF ¶ 112), was offered the position. As also explained above, Arnold has presented evidence to create a triable issue as to whether Janssen's explanation for not hiring her is pretextual. Thus, Defendants' Motion is denied as to Arnold's claim for retaliation.

### 3.     Hostile Work Environment

Arnold alleges that she was subjected to a hostile work environment that was motivated by her gender and retaliation. For Arnold to prevail on a claim of sexual harassment based on hostile work environment, she must establish that: "(1) she was subjected to unwelcome sexual harassment; (2) the harassment was based on her sex; (3) the sexual harassment unreasonably interfered with her work performance by creating an intimidating, hostile or offensive work environment that affected seriously the psychological well-being of the plaintiff; and (4) there is

13

a basis for employer liability." *McPherson v. City of Waukegan* 379 F.3d 430, 437-38 (7th Cir. 2004). To prove that a hostile work environment existed, Arnold must put forth sufficient evidence that she "was subjected to conduct so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Id.* at 438 (internal quotation omitted); *accord Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). The creation of a hostile work environment can also be a form of retaliation. *See Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 567 n.5 (7th Cir. 2004) (citing *Knox v. State of Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996). To constitute actionable retaliation, however, Arnold must prove that the events and actions she suffered were "serious enough to create an abusive environment that altered [her] employment." *Id.* at 568.

Defendants argue that they are entitled to summary judgment on this claim because there is no evidence that she was harassed or that the terms and conditions of her employment were affected. (Motion at 3.) The Court finds that Arnold has failed to create an issue of fact as to whether she suffered from a hostile environment that unreasonably affected her employment.

"To qualify as hostile, the work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *McPherson*, 379 F.3d at 438 (internal quotation omitted); *accord Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000). In determining whether Arnold's work environment was objectively hostile, the Court "must consider all of the circumstances, including the frequency and severity of the conduct; whether it was threatening and/or humiliating or merely an offensive utterance; and whether the harassment unreasonably interfered with her work." *McPherson*, 379 F.3d at 438 (citing *Wyninger v. New Venture Gear*,

14

*Inc.*, 361 F.3d 965, 975-76 (7th Cir. 2004)).

Arnold points to several incidents as evidence that she was subjected to a hostile work environment. Plaintiff presents evidence of actions by McGonigal and Parks surrounding Janssen's failure to promote her to a hospital representative in 1997 (Pl. SAF ¶¶ 19, 20) and to two DM positions with Janssen and a management position with another Johnson & Johnson company, Othobiotec, in 1999 (*id.* ¶¶ 21-26). These events are outside the 300-day statute of limitations for Title VII violations and cannot be considered by the Court.[9] *See* 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112-13 (2002). Arnold argues that all the actions by McGonigal and Parks, including those outside the 300-day time period, were part of "'one unlawful employment practice,'" and are therefore properly considered here, presumably under the continuing violation doctrine. (Pl. Resp. Br. at 14 n.3 (quoting *Nat'l R.R.*, 536 U.S. at 118).) A failure to promote, however, is a discrete act of discrimination, *id.* at 114, and "claims based on [discrete] acts cannot be rendered timely by application of the continuing violation doctrine." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 724 (7th Cir. 2004); *accord Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 708 ("[A] plaintiff who feels discriminated against by a discrete act, but fails to timely file charges on that act, cannot later reach back to those events when the statute of limitations expires in order to form a continuing violation claim.").

She also offers numerous incidents that occurred throughout 1995 that could possibly be characterized as evidence of hostile, gender-based activity. (*See, e.g.*, Pl. SAF ¶ 29 (male co-

---

[9] Arnold filed her charge of discrimination on May 7, 2001. (Def. SF ¶ 3.) Thus, events that occurred before July 11, 2000, are outside the applicable limitations period.

workers told Plaintiff that her successes were due to her looks), ¶ 30 (male supervisors encouraged her and other women to get in a hot tub so that women's bodies could be observed), ¶ 31 (Plaintiff was subject of sexual jokes and offensive stories).) Under applicable precedent, the incidents from 1995 are too remote in time to be considered along with any events that occurred since July 2000. The Seventh Circuit teaches that "the concept of cumulation suggests a critical limiting principle. Acts so discrete in time or circumstances that they do not reinforce each other cannot reasonably be linked together into a single chain, a single course of conduct, to defeat the statute of limitations." *Tinner*, 308 F.3d at 708 (internal quotation and alteration omitted); *see also Lucas*, 367 F.3d at 727 (three-year gap between events not part of same hostile work environment). Arnold offers only one incident that occurred in 1999 to break the gap between 1995 and 2000—a refusal to place her in a DM position in West Chicago because she was a woman. (Pl. SAF ¶¶ 22-24.) But this, too, constitutes a discrete act that cannot save the timeliness of her complaint. *See Tinner*, 308 F.3d at 708 (plaintiff "cannot later reach back to [discrete acts] when the statute of limitations expires in order to form a continuing violation claim").

The remaining incidents—even if they were considered part of a single continuing violation, *see Lucas*, 367 F.3d at 724—do not create a triable issue as to whether Arnold was subject to a hostile work environment. Arnold points to actions surrounding her promotion to a DM in New York in August 1999 that might indicate that Parks and McGonigal were interfering with her chance for promotion. (Pl. SAF ¶¶ 14-18.) Even if the actions she alleges are true, these actions did not unreasonably interfere with her work as they did not prevent Arnold from actually obtaining the promotion. (Pl. SAF ¶ 14.) Arnold also states that McGonigal and Parks

16

were "lobbying" against her after she returned from her medical leave. (Pl. SAF ¶ 58.) But her admissible evidence is only that McGonigal told a colleague that Arnold was difficult to work with (McGonigal Dep. at 198) and that Parks described her as "emotional" or "high-maintenance" (Reardon Dep. at 175-76). Arnold also points to her testimony that when she was in the EROD rotation, Cannady was hostile to her and did not give her information she needed. (Pl. SAF ¶ 60.) Even if true, there is no indication that her inability to work with Cannady, while it may have been inconvenient, altered her work environment in a detrimental way (as it might have, for example, if she had received poor performance reviews for her inability to accomplish her job). These instances, and the others she describes, simply do not rise to the level of an objectively hostile or abusive work environment (nor do they appear to be related to her gender), and Defendants are thus entitled to summary judgment on that claim.

B.    ADA Claims

1.    Failure to Accommodate

The ADA requires an employer to make a reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability who is an employee, unless the accommodation would impose an undue hardship on the employer. *See* 42 U.S.C. § 12112(b)(5)(A). In order to recover under the ADA for an employer's failure to reasonably accommodate, a "plaintiff must show: (1) that she was or is disabled as defined by the Act, (2) that her employer was aware of the disability, and (3) that she was qualified for the position in question." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). Janssen argues that Arnold is not disabled, that Arnold never told Janssen that she was disabled or asked for an accommodation, and that the accommodations Arnold sought were unreasonable.

17

Arnold has created an issue of fact as to whether she is disabled for purposes of the ADA. An individual is disabled if she has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." *See* 42 U.S.C. § 12102(2)(A); *accord Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 478 (1999). Arnold has presented undisputed evidence that she has been diagnosed with chronic pain syndrome and then neuropathic myofacial pain syndrome. (Pl. SAF ¶ 5.) She has adduced evidence that creates a triable issue as to whether she was substantially limited in the major life activity of lifting.[10] Arnold was under a restriction limiting her lifting to no more than 10 pounds from September 2000 to the time her employment with Janssen ended. (Pl. SAF ¶ 4 (citing Pl. Aff. ¶ 5); Carroll Aff., Ex. A.)[11] Defendants argue that a physical impairment that results in a 10-pound restriction is insufficient to constitute a disability for purposes of the ADA under *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184 (2002), and *Mays v. Principi*, 301 F.3d 866 (7th Cir. 2002).[12]

Precedent teaches that to determine whether a plaintiff is limited in a major life activity,

---

[10] Defendants do not argue that lifting is not a major life activity generally, just that it is not a major life activity as manifested by Arnold's restrictions. (*See* Motion at 15.) *See Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 21 (1st Cir. 2002) ("Whether lifting pen to paper or glass to mouth, lifting is an integral part of everyday life and seems to fit comfortably within the parameters set by the Court."). The only other major life activity Arnold put forward in response to Defendants' Motion was moving. The Court need not decide whether this constitutes a major life activity for the purposes of the ADA.

[11] The portion of Arnold's affidavit that described her lifting restriction as "5-10" pounds was stricken by the Court in an Order addressing Defendants' Motion to Strike (D.E. 143) filed contemporaneously with this opinion. As explained earlier, the Court reserves the question whether Ms. Arnold can testify to any 5-pound limitation at trial, where Defendants can cross-examine her and/or any related medical witnesses or treaters.

[12] The Court notes that Defendants do not contest that Arnold was under a 10-pound lifting restriction while she was employed at Janssen. Defendants' argument is limited to whether this restriction was severe enough to constitute a disability.

18

the activity in question "must be central to daily life." *Williams*, 534 U.S. 197 (analyzing the major life activity of performing manual tasks). Defendants point to *Mays*, in which the Seventh Circuit expressed doubt as to whether a back injury that caused a lifting restriction of more than 10 pounds could constitute a disability. *See Mays*, 301 F.3d at 869. But the determination of whether a litigant has a disability is an individualized inquiry, one to be made on a case-by-case basis, *see Williams*, 534 U.S. at 198, and the Seventh Circuit has *not* held that a lifting restriction like Arnold's cannot constitute a disability as a matter of law, *accord Nicholas v. Acuity Lighting Group, Inc.*, No. 1:03CV1005-DFH-TAB, 2005 WL 280341, at *4 (S.D. Ind. Jan. 4, 2005) (Hamilton, J.) (noting that *Mays* did not flatly reject the theory that a lifting restriction can amount to a disability). Arnold has offered evidence that because of her inability to lift more than 10 pounds she cannot have a child (because she would be unable to carry or pick up the child, even as a relative newborn); she cannot use heavy doors; she cannot buy groceries in bulk; she cannot reach items over her head, including kitchen items or some clothing. (Pl. SAF ¶ 4.) The Court finds that these activities are "the very type of evidence" that would allow a trier of fact to conclude that Arnold's lifting restrictions and pain substantially limit activities central to daily life. *See Williams*, 534 U.S. at 202 (holding that appeals court improperly disregarded as irrelevant evidence of ability to perform personal or household chores). Plaintiff has brought forward evidence of more than mere limitations on the work she is able to do. *Compare Mays*, 301 F.3d at 869 (noting that physician thought plaintiff could return to job as a light-duty nurse). Rather, by bringing forward evidence of the way in which ordinary, daily chores and activities have been severely limited by her lifting restriction, she has created a question of fact as to

19

whether she has a disability.[13]

Defendants next argue that Arnold never told her employer that she was disabled or asked for an accommodation. Arnold testified that she had informed her supervisors, Parks and McGonigal, "every step of the way" as to how her increased pain impacted her job functions. (Pl. SAF ¶ 5.) Arnold had been out on a medical leave of absence for several months in 2000 and returned to work with restrictions from September 2000 onward. (Def. SF ¶ 14; Pl. SAF ¶ 49.) Additionally, Arnold produced a memo from Parks to Cannady dated November 16, 2000, in which Parks stated,

> I also think we may be at risk of a future lawsuit if we do not address her work limitations. She told me that she is not following physician orders for rehab and it was due to the EROD job requirements. She is not supposed to carry anything over 10 pounds, but her briefcase (with computer) exceeds 10 pounds. She is also not doing the physical therapy prescribed because we continue to "make" her travel . . . . We are not doing Ashley any good by having her ignore her rehab and continue to have her perform tasks that have been clearly defined by her physician as inappropriate. We are exposing ourselves to potential litigation should she further injure herself trying to meet the EROD job demands.

(Pl. Ex. 5.) With this evidence, Arnold has created a question of material fact as to whether Defendants were aware of her disability and her need to be accommodated due to her lifting restrictions.

Defendants argue that Arnold's requested accommodations were unreasonable. On more than one occasion in 2000 and 2001, Arnold had requested from Reardon that she be allowed to use a service to meet her at the airport to get her bags. (Pl. SAF ¶ 7.) Those requests were

---

[13] That Defendants have offered evidence of activities that Plaintiff *can* do (*see* Def. SF ¶¶ 73-76) does not defeat her claim on summary judgment—it merely creates an issue of fact as to whether the ability to accomplish certain tasks versus others "substantially limit[ed]" Arnold's lifting. *See* 42 U.S.C. § 12102(2)(A).

denied. (*Id.*) Arnold also points to numerous options that she proposed to Reardon in early 2001 when she told him that she would be physically unable to perform the RTM job offered to her: she could stay in the EROD position until a new position was available; the RTM position could be modified to be supervisory with less travel and lifting; she could be considered for a regional business director position; she could be permitted to work on a part-time or flex-time basis; she could interview for DM positions with other Johnson & Johnson companies; she could work in the RTM position until another DM position arose (as compared to the two-year commitment Janssen wanted); or she could take paid or unpaid leave. (Pl. SAF ¶ 103.) Defendants are correct that Janssen was not required to create an entirely new job for Arnold, which is how Defendants characterize her request to be made a "senior" RTM with only supervisory duties or to stay in a position that Janssen told her was being terminated. *See Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002) (ADA does not require employer to create different job comprising a subset of tasks from existing job); *Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 484-85 (7th Cir. 2002) ("Under the ADA, an employer is not required to modify, reduce, or reallocate the essential functions of a job to accommodate an employee."). But her requests to have help so that she would not be required to lift heavy objects during travel (*see* Pl. SAF ¶ 11) could be determined to be reasonable by a rational trier of fact, and, indeed, Defendants do not argue to the contrary regarding this particular accommodation.

Thus, Defendants' Motion for summary judgment is denied as to Arnold's failure to accommodate claim.

### 2. Discrimination

To make out a claim of discrimination based on disparate treatment because of disability,

a disabled employee must show that (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of her job, with or without a reasonable accommodation; and (3) she has suffered from an adverse employment action because of her disability. *Dvorak*, 289 F.3d at 483. Like other employment discrimination statutes, a plaintiff under the ADA may proceed under either the direct or indirect method. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). Arnold has adduced sufficient direct evidence of discrimination based on her disability to defeat summary judgment.

First, as discussed *supra*, Arnold has created a triable issue as to whether she is disabled. Second, Defendants have not argued that she was not otherwise able to perform the essential functions of management with or without accommodation, so the Court will assume that she has met this prong. Third, she has produced evidence that creates a question of fact as to whether she suffered an adverse employment action because of her disability. Based on the evidence she has produced, a reasonable trier of fact could conclude that she was constructively discharged by Defendants.[14]

"Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes."[15] *Penn. State Police v. Suders*, 542 U.S. 129, __, 124 S. Ct. 2342, 2351 (2004). The

---

[14] Arnold also claims that Janssen's failure to place her in various positions, including as the 275 DM and as a reimbursement manager, also constituted discrimination on the basis of her disability.

[15] Although the Seventh Circuit has not decided whether a claim of constructive discharge is cognizable under the ADA, *see EEOC v. Sears*, 233 F.3d at 440; *but see id.* at 440 n.6 (indicating that if the question were presented to it, it would find such a claim under the ADA), at least one case in this district supports the notion that such a claim is proper, *see, e.g., Bond v. Sheahan*, 152 F. Supp. 2d 1055, 1071 (N.D. Ill. 2001) (citing additionally *Seisser v. Platz*

22

inquiry is an objective one where a court asks whether "working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign[.]" *Id.* (holding that Title VII encompasses employer liability for a constructive discharge). Assuming that Arnold's version of events is true, *i.e.* that Janssen told Arnold that her only option was to take a position as a RTM, without accommodation, that would violate her medical restrictions and did not tell her that other options were still on the table, a reasonable jury could find that her working conditions were so unendurable as to leave her no choice but to leave. Being presented with no option other than to take a job that would cause her severe pain is very different from one "which at the most would require an employee to slightly rearrange her schedule." *EEOC v. Sears*, 233 F.3d at 441 (affirming denial of summary judgment for constructive discharge where arguably disabled employee was asked to work a schedule she did not prefer). Based on Arnold's evidence that Reardon had dismissed numerous alternative options Arnold presented and told her that the RTM position would not be modified in any way (Pl. SAF ¶ 87), the Court finds that she has created a triable jury question as to whether her work conditions had become so unbearable that quitting was the only option available to her.[16] Thus,

---

*Flowers and Supply, Inc.*, 129 F. Supp. 2d 1130, 1136 (N.D. Ill. 2000)); *see also Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 332-34 (7th Cir. 2004) (analyzing constructive discharge claim under ADA without discussing whether such claim is cognizable). In any event, Defendants have not moved for summary judgment on the ground that a constructive discharge claim is not cognizable under the ADA.

[16] Contrary to Defendants' suggestion (*see* Def. Reply Br. at 13-14), Arnold need not have stayed and begun working in the job presented to her for a rational jury to find that she suffered unendurable working conditions; such a holding would be antithetical to the prophylactic nature of federal employment discrimination statutes. *See generally Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999) ("[Title VII's] 'primary objective' is 'a prophylactic one; it aims, chiefly, 'not to provide redress but to avoid harm.'") (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975), and *Faragher v. Boca Raton*, 524 U.S. 775, 806 (1998)).

Defendants' Motion is denied as to Arnold's claim of discrimination based on disability.

C. Breach of Contract

Arnold alleges that the company's sexual harassment policy created a contractual relationship between Janssen and her that Janssen breached when she was subjected to discrimination and retaliation. The Illinois Supreme Court teaches that "an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation [offer, acceptance, and consideration] are present." *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987) (holding that an employee handbook created enforceable rights to the disciplinary procedures described therein). To create enforceable rights, "the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer had been made." *Id.* The policy statement must be given to the employee "in such a manner that [she] is aware of its contents and reasonably believes it to be an offer . . . [and] the employee must accept the offer by commencing or continuing to work after learning of the policy statement." *Id.* Whether an employer's policy statement constitutes a contract is a question of law for the Court to decide. *Svigos v. Petry Television, Inc.*, No. 95 C 5899, 1996 WL 388416, at *2 (N.D. Ill. 1996) (Coar, J.) (citing *Barefield v. Village of Winnetka*, 81 F.3d 704, 709 (7th Cir. 1996)); *Brown v. R.R. Donnelly & Sons Co.*, 650 N.E.2d 8, 9 (Ill. App. Ct. 1995).

---

Indeed, the Supreme Court has expressly stated that an employee quitting is a "reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation" such as a "transfer to a position in which [an employee] would face unbearable working conditions." *Penn. State Police v. Suders*, 542 U.S. 129, __, 124 S. Ct. 2342, 2347 (2004); *see also id.* (holding that, in same situation, the *Ellerth/Faragher* affirmative defense is not available to employer).

24

Arnold argues, in the most general terms, that "[t]here was mutual consideration [for the alleged contract] as Arnold's work was of benefit to Defendants and Defendants['] agreement not to discriminate and not to retaliate was of benefit to Arnold." (Arnold Resp. Br. at 21.) She does not argue that any particular language, whether in oral or written form, was sufficiently clear to constitute an enforceable promise under Illinois law. Arnold points to deposition testimony that (1) she saw Janssen's "Credo" and discussed anti-discrimination and anti-harassment policies at the interviews she attended, and (2) she received mailings regarding the company's policies as to equal employment opportunities and anti-harassment. (SAF ¶ 113 (citing Arnold Dep. at 540, 549; Pl. Ex. 9, 10, 12).) To the extent she relies on the language of Janssen's Credo to support her contract claim at this point, that argument is barred by law of the case. On Defendants' earlier Motion to Dismiss, Judge Gottschall[17] held that the language of the Credo "contains no promise clear enough to lead an employee to reasonably believe that an offer has been made."[18] *Arnold v. Janssen Pharmaceutica, Inc.*, 215 F. Supp. 2d 951, 963 (N.D. Ill. 2002) ("*Arnold I*"). Arnold has not asked this Court to reconsider Judge Gottschall's ruling, and the Court declines to do so. To the extent that Arnold is relying on oral statements made to her during her interviews, the Court finds that Arnold has failed to adduce sufficient evidence of any promise made by Janssen that would constitute an enforceable contract. Pointing to vague testimony as to

---

[17] This case was reassigned to this Court from the docket of Judge Gottschall on March 3, 2004.

[18] Neither side provided the court with specific language from the sexual harassment policy (nor do they do so here), and Judge Gotschall therefore declined to evaluate the merits of Defendants' contention that the policy, like the Credo, did not contain a sufficiently definite promise to constitute a contract. *Arnold v. Janssen Pharmaceutica, Inc.*, 215 F. Supp. 2d 951, 963 (N.D. Ill. 2002).

discussions about anti-discrimination policies does not suffice at summary judgment, where Arnold bears the burden of setting forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Her failure to identify specific language of any alleged promise made by Janssen defeats her claim based on oral representations by Janssen.

The mailings on which Arnold relies are two identical memoranda, dated March 22, 1999, and April 6, 2000, sent to "All Janssen Employees and Applicants." (Pl. Ex. 9, 10.) Arnold does not specify particular language which she believes constituted a binding promise on Janssen, and the Court finds that no part of the memoranda does so. The language of the memos speaks in broad policy terms of Janssen's "continuing commitment to the principles and objectives of equal opportunity and affirmative action . . . [as] an expression of the philosophy of the Johnson & Johnson Credo." (*Id.*) The memos go on to state:

> We must provide a climate conducive to contributions from people of all backgrounds and experiences, and share in the responsibility of improving our equal opportunity platform. . . . Our equal opportunity policies and affirmative action programs are designed to ensure that all applicants and employees are considered without regard to . . . gender . . . [or] disability . . . except where an accommodation is unavailable and an individual's disability is a bona fide occupational disqualification. . . . Employees and applicants are also protected from coercion, intimidation, interference, or discrimination for filing a complaint or assisting in an investigation. . . . All questions and concerns may be addressed to [the Director of Human Resources], to any individual in your supervisory chain or to your Human Resources representative.

(*Id.*) This language, like the language of Janssen's Credo, is nothing more than a vague promise to treat Janssen employees fairly and in compliance with applicable law.[19] *Arnold I*, 215 F. Supp.

---

[19] At least one court in this district has held that where an anti-discrimination policy simply restates an employer's obligations under the law, the policy does not create enforceable contractual rights because it is unsupported by consideration. *See Willis v. Evans Prods. Co.*, No. 86 C 9111, 1987 WL 11337, at *6 (N.D. Ill. May 4, 1987) (Hart, J.).

2d at 963. The memos do not purport to create any rights among Janssen employees such as, for example, a right that Janssen will take any particular action in response to a report of harassment. *Compare Corluka v. Bridgford Foods of Ill., Inc.*, 671 N.E.2d 814, 818 (Ill. App. Ct. 1996) (finding employer's sexual harassment policy rose to level of contract where memo stated more than a general policy or employer expectations but rather promised that all harassment complaints "will be thoroughly investigated" and that employer "will take immediate action to punish anyone who seeks reprisal as a consequence of harassment being reported"). No reasonable person would believe that an offer had been made in these memos to create rights of such a kind. *Duldulao*, 505 N.E.2d at 318. Thus, Defendants are entitled to summary judgment on Arnold's breach of contract claim.

## IV.    Conclusion

For the reasons stated above, the Court grants in part and denies in part Defendants' Motion for Summary Judgment. Arnold's claims as to sex discrimination and retaliation and her claims under the ADA remain. Arnold's claims based on a sexually hostile work environment and breach of contract do not. The Court declines to address Defendants' arguments regarding punitive damages at this juncture—given the limited evidence before the Court and the better position the Court will enjoy at the conclusion of trial—without prejudice to Defendants' ability to raise the issues again during or at the conclusion of trial.

So ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Date: *May 16, 2005*

27